# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BENJAMIN ANDREW SANDRY, | CIVIL NO. 11-3589 (RHK/AJB) |
| PLAINTIFF, | |
| V. | **REPORT & RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | |
| DEFENDANT. | |

Michael F. Cockson and Synda A.J. Mark, Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for Plaintiff.

Ana H. Voss, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant.

## <u>INTRODUCTION</u>

Plaintiff Benjamin Andrew Sandry disputes the unfavorable decision of Defendant Commissioner of Social Security (the "Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court, Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.1-2.

For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (Docket No. 18) be denied and the Commissioner's Motion for Summary Judgment (Docket No. 20) be granted.

# FACTS

## I.	BACKGROUND

Mr. Sandry was 37 years old at the time of the ALJ's decision.  (*See* Tr. 38.)  At the time of the alleged disability onset date, Mr. Sandry was 33 years old.  (*See* Tr. 120.)  He has a high school education.  (Tr. 38.)  Mr. Sandry is a veteran who served in the Army in 1991 and in the Army National Guard from 1991 to 1993.  (Tr. 270.)

Mr. Sandry stopped working on February 20, 2007, the alleged disability onset date, at which time he was a turkey farm manager.  (Tr. 163-65.)  Mr. Sandry worked as a tree trimmer from 1993 to 2002, prior to injuring his knee in a fall from a tree.  (Tr. 336.)  Mr. Sandry performed some temporary work after February 2007, including making bee hives and packaging fish, but his earnings did not rise to the level of substantial gainful activity.  (Tr. 226, 138.)  Mr. Sandry was noted in various medical records to be performing other work after February 2007, but there is no indication that his work activities rose to level of substantial gainful activity.  (*See* Tr. 10.)  Mr. Sandry's past relevant work is as a turkey farm manager.  (Tr. 225.)

## II.	RELEVANT MEDICAL EVIDENCE

### A.	Mr. Sandry's Treatment Records

Mr. Sandry has a history of knee injuries.[1]  He has a 20% service-related disability rating by the Veterans Administration for right knee strain and loss of movement.  (Tr. 242.)  Mr. Sandry had a history of right knee strain prior to military service and underwent right knee

---

[1]	Although other health issues are presented in Mr. Sandry's medical history and noted by the ALJ as severe medical impairments (*see* Tr. 10-11), they did not significantly factor into Mr. Sandry's motion for summary judgment.  As a result, this Report and Recommendation does not detail Mr. Sandry's medical history with respect to his other impairments, in particular his shoulder injuries, affective disorder, and post-traumatic stress disorder.

surgery in 1988. (Tr. 283.) After entering the service, he twisted his knee while running during military training and had a second arthroscopic surgery on the right knee in 1991. (Tr. 340.)

Mr. Sandry injured his left knee in 2001 or 2002, when he fell 60 feet out of a tree while working as a tree trimmer. (Tr. 291, 340.) He sustained a fracture to the left tibia for which he underwent an open reduction, internal fixation surgery with a plate and four screws in the left knee. (Tr. 291, 340.)

On February 6, 2007, Mr. Sandry visited Dr. Paul Rud complaining of left knee pain. (Tr. 625.) Dr. Rud noted post-traumatic arthritis and observed that Mr. Sandry's left knee had a moderate effusion, with some medial joint line tenderness. (Tr. 625.) Dr. Rud prescribed Lodine, to be supplemented with Tylenol. (Tr. 625.) Mr. Sandry was seen the following month by Dr. David Freeman, again for left knee pain. (Tr. 623.) Dr. Freeman noted that Mr. Sandry was in no acute distress, but had an effusion anteriorly, moderate in size, with some multidirectional laxity. (Tr. 623.) Dr. Freeman assessed post-traumatic arthritis, with a possible meniscal injury. (Tr. 623.) Dr. Freeman prescribed an ACL brace and renewed Mr. Sandry's Lodine prescription. (Tr. 623.) Dr. Freeman noted that "we will have him continue to work as he can." (Tr. 623.)

Dr. Corinne Davis evaluated Mr. Sandry for a right knee condition on May 2, 2007. (Tr. 339.) Mr. Sandry reported constant right knee pain which varied in intensity from 3 out of 10 to 9 out of 10, but averaged 3 to 4 out of 10. (Tr. 340.) Mr. Sandry had increased right knee pain with walking, kneeling, squatting, cold weather, and stairs. (Tr. 340-41.) He could stand for one to one and one half hours and walk one to one and one half blocks, limited by his left knee condition, not his right. (Tr. 340-41.) Mr. Sandry had decreased knee pain with rest, a hot bath, and ice. (Tr. 340.) Mr. Sandry reported being independent in activities of daily living, with no

flare-ups during which he was unable to care for himself.  (Tr. 341.)  Mr. Sandry's sitting

tolerance was within normal limits, but his sit-to-stand required the aid of his upper extremities.

(Tr. 341.)  His gait was markedly antalgic with decreased weight-bearing on the left lower

extremity but not the right lower extremity.  (Tr. 341.)  He was able to walk on toes and heels

and could squat and return to standing position.  (Tr. 341.)  Mr. Sandry had an active range of

motion with full extension without pain and flexion of 110 out of 140 with pain between 105 and

110.  (Tr. 341.)  Dr. Davis diagnosed right knee strain and found the radiological work-up

showed no significant right knee degenerative joint disease.  (Tr. 342.)

Dr. Davis evaluated Mr. Sandry for left knee pain and right knee strain, in addition to

back and hip pain, on January 22, 2008.  (Tr. 334.)  There is no record of treatment for his knee

issues between May 2007 and January 2008.  Mr. Sandry reported to Dr. Davis that his left knee

pain was greater than the right.  (Tr. 336.)  His knee pain was constant, with the left averaging 7

out of 10 and the right averaging 4 out of 10.  His pain was increased by kneeling, squatting,

stairs, standing, or waking and decreased by Icy Hot, medications, stretching, and resting.  (Tr.

336.)  Mr. Sandry reported being independent in activities of daily living.  (Tr. 336.)  He could

stand for 30 to 45 minutes and walk one block.  (Tr. 336.)  Sitting tolerance was within normal

limits, sit-to-stand required the aid of his upper extremities, and his gait was antalgic with

decreased weight-bearing in the left lower extremity.  (Tr. 336.)  He was able to walk on toes,

heels, fully squat, and return to standing position.  (Tr. 336.)  Dr. Davis found the diagnostic

work-up revealed mild joint space narrowing and osteoarthritis of the medial and lateral

compartments of the left knee and no evidence of acute interosseous injury of bilateral knees.

(Tr. 338.)

Mr. Sandry visited Dr. Mark Rudel on March 5, 2008 for follow-up on the left knee. (Tr. 300.) Mr. Sandry reported that two weeks prior to the appointment, he had been seen in an emergency room due to a knee dislocation, for which he was placed in a knee immobilizer and given crutches. (Tr. 300.) Mr. Sandry stated that as of the time of the appointment, his knee was improved and he was back to work with climbing trees. (Tr. 300.) He continued to have day-to-day pain for which he was taking Etodolac, but it did not help very much. (Tr. 300.) Examination of the knee revealed no swelling, good stability, and Mr. Sandry was able to extend the knee except for a couple of degrees due to pain. (Tr. 301.) Review of a CT scan showed degenerative changes in all three compartments. (Tr. 301.) Dr. Rudel prescribed Tylenol 3 to use as needed for pain not controlled by Etodolac and also ordered a knee brace. (Tr. 301.) Dr. Rudel discussed that possible removal of the hardware and arthroscopic debridement were more aggressive interventions to be considered if necessary. (Tr. 301.)

Mr. Sandry was examined by Dr. John Baker at the V.A. Medical Center in Bay Pines, Florida on May 30, 2008 for bilateral severe knee pain, worse on the left than the right. (Tr. 291.) Dr. Baker stated that Mr. Sandry has severe post-traumatic arthritis in the left knee which needs a total knee replacement after the metal is removed. (Tr. 291.) Dr. Baker opined that this surgery is "the reason he is totally disabled because the left knee [] injury is now aggravating the right knee [] injury to where he cannot work or walk." (Tr. 292.) Dr. Baker stated that the right knee needed to be arthroscoped because Mr. Sandry had a torn medial meniscus and that the plan was to do the total knee replacement on the left knee and then arthroscope the right knee. (Tr. 292.)

Mr. Sandry saw nurse practitioner Cathy Devincenzi at the Fargo, North Dakota V.A. Medical Center on October 23, 2008. (Tr. 472.) Mr. Sandry reported that he had been scheduled

to undergo a total knee replacement of his left knee in Florida, but left the area before the surgery could be completed.  (Tr. 472.)  Mr. Sandry complained of significant knee pain, which was causing pain into his lower back and feet.  (Tr. 472.)  He was taking Etodolac, which was doing nothing for his pain.  (Tr. 472.)  He reported that his back and knee hurt so badly that he slept sitting up.  (Tr. 475.)  Ms. Devincenzi observed that Mr. Sandry could rise and change position without difficulty or loss of balance.  (Tr. 475.)  He was in no acute distress, but had an antalgic gait.  (Tr. 475.)  Ms. Devincenzi ordered a physical therapy consult, x-rays of both knees, and an orthopedic consult for knee evaluation.  (Tr. 476.)  X-rays revealed traumatic degenerative arthropathy in the left knee, but the right knee was normal.  (Tr. 407.)

Mr. Sandry was referred to Dr. Nicholas Yokan for an orthopedic consult on November 6, 2008.  (Tr. 467.)  Mr. Sandry reported his left knee pain as a constant 6 out of 10 and with walking, up to 8 out of 10.  (Tr. 468.)  Mr. Sandry used a cane and could walk up to three blocks.  (Tr. 468.)  Mr. Sandry was taking Vicodin.  (Tr. 468.)  Examination showed the left knee had normal alignment, had no effusion, had diffuse tenderness about the knee medially, laterally, and posteriorly, and was stable.  (Tr. 468.)  The right knee had no effusion, mild medial and lateral tenderness, and was stable.  (Tr. 468.)  Dr. Yokan diagnosed post-traumatic arthritis of the left knee, with moderate radiographic changes.  (Tr. 468.)  Dr. Yokan observed that Mr. Sandry was 34 years old and quite young to consider total knee arthroplasty and suggested Mr. Sandry get a second opinion from Dr. Charles Hartz.  (Tr. 469.)

Mr. Sandry visited Dr. Hartz on January 23, 2009.  (Tr. 463.)  Upon examination of the knees, Dr. Hartz observed the right knee had full range of motion with no effusion and good ligamentous stability and the left knee had full range of movement with small effusion and good ligamentous stability.  (Tr. 463.)  Dr. Hartz recommended an arthroscope evaluation of the left

knee and removal of hardware, and an arthroscope of the right knee when it was symptomatic. (Tr. 463.) Dr. Hartz opined that Mr. Sandry was not a candidate for total left knee replacement and that removal of the hardware may resolve his knee issues. (Tr. 463.) On the same day, Mr. Sandry visited Dr. Yokan for follow-up, who noted that they would schedule an arthroscopy of the left knee and removal of the hardware. (Tr. 464.) Mr. Sandry was not in acute distress, was not limping, and the knee was stable. (Tr. 465.)

Dr. Yokan performed a left knee arthroscopy on February 11, 2009. (Tr. 293.) The surgery revealed medial and lateral meniscal tears and a partial lateral meniscectomy was performed, as well as removal of the fixation devices. (Tr. 293.) Dr. Yokan's post-operative plan indicated Mr. Sandry should do weight-bearing and activity as tolerated. (Tr. 295.) No further restrictions were noted. Mr. Sandry had some swelling and tenderness following the surgery. (Tr. 452-54.)

Mr. Sandry had a follow-up visit with Dr. Yokan in April 2009. (Tr. 446.) Mr. Sandry reported that his knee was feeling better. (Tr. 446.) He had been swimming regularly and doing stationary bicycling. (Tr. 446.) Mr. Sandry reported that he would like evaluation of his right knee, in which he felt occasional sharp catching pain. (Tr. 446.) Examination showed that Mr. Sandry was in no apparent distress. (Tr. 446.) He walked without any assistive device. (Tr. 446.) The left knee had no effusion and was stable. (Tr. 446.) His right knee had no effusion, had full motion, and was stable. (Tr. 446.) Dr. Yokan noted that Mr. Sandry's left knee was doing well following removal of the hardware but that the lateral meniscus was absent and that the right knee may have a meniscal tear. (Tr. 446.) Dr. Yokan recommended consideration of a meniscal transplant on the left knee and ordered an MRI on the right knee. (Tr. 446.) MRI imaging indicated there was a small meniscal tear in the right knee. (Tr. 489.)

Mr. Sandry next was seen by Dr. Hartz for knee pain in June 2009. (Tr. 303-04.) Mr. Sandry described chronic problems with both knees for a long time, with the right being worse than the left. (Tr. 304.) Upon examination, Mr. Sandry's left knee was normal and unremarkable. (Tr. 304.) His right knee had a full range of motion with no effusion and stable ligaments. (Tr. 304.) X-rays revealed normal right and left knees. (Tr. 304.) Dr. Hartz noted the recurrent problems were likely cartilage deterioration in the knee joint. (Tr. 304.) He prescribed knee braces and scheduled Mr. Sandry for an arthroscope surgery on the right knee. (Tr. 304.)

Mr. Sandry saw Dr. Byron Busch for a physical examination on July 22, 2009. (Tr. 333.) Mr. Sandry had an antalgic and slow gait while wearing his knee braces and using a cane. (Tr. 325.) X-rays showed that the joint spaces on Mr. Sandry's right knee were maintained. (Tr. 332.) Mr. Sandry reported that because of his knees, he needed help getting in and out of the bath tub, his son had to help him tie his shoes, he avoided activities such as football and skiing, he exercised his upper body only, he hunted from his car, he needed help getting in and out of a boat for fishing, and he had to get a riding lawn mower. (Tr. 333.) Dr. Busch noted with respect to employability, that he agreed with a previous vocational rehabilitation evaluation performed at the Bay Pines, Florida V.A. that Mr. Sandry should get some retraining and could do light duty work. (Tr. 333.) Dr. Busch noted that "I think he is employable but will need to avoid heavy lifting." (Tr. 333.)

Mr. Sandry had an appointment with Ms. Devincenzi shortly before having right knee arthroscope surgery in September 2009. (Tr. 425.) At that time, he rated his pain as 6 out of 10 even while wearing his knee braces. (Tr. 425.) Ms. Devincenzi prescribed a new pain medication. (Tr. 427.) Dr. Hartz performed a right knee arthroscopy and debridement of the

medial femoral condyle on September 22, 2009.  (Tr. 424.)  There was a small cyst at the ACL, but no tears in the meniscus.  (Tr. 424, 478.)  Mr. Sandry saw physician's assistant Sharon Ries for a post-operative follow-up visit on October 7, 2009.  (Tr. 423.)  Mr. Sandry reported that his right knee pain was about the same, but he did not have any catching.  (Tr. 423.)  Mr. Sandry's main concern was his left knee.  (Tr. 423.) Ms. Ries consulted with Dr. Hartz regarding Mr. Sandry's left knee pain, who agreed that Mr. Sandry would be a good candidate for a meniscal transplant.  (Tr. 423.)

Dr. Hartz next examined Mr. Sandry on February 17, 2010.  (Tr. 497.)  Mr. Sandry reported that his left knee was still painful and that he had pain with walking, stepping, twisting, and pivoting.  (Tr. 497.)  He had occasional swelling.  (Tr. 497.)  Left knee examination revealed tenderness over the medial joint line, good ligamentous stability, and full range of movement.  (Tr. 497.)  Dr. Hartz noted that the left knee should be managed conservatively until Mr. Sandry could not tolerate it any longer, after which he would probably require total knee replacement.  (Tr. 497.)  Radiological imaging showed prominent degenerative changes of the left knee joint, while the right knee joint spaces appeared approximately preserved.  (Tr. 494-95.)

On July 16, 2010, Mr. Sandry saw Dr. James Johnson for left knee pain.  (Tr. 606.)  Dr. Johnson noted that Mr. Sandry did well following his February 2009 left knee surgery, but that he had stepped in a hole recently and twisted his knee.  (Tr. 606.)  Mr. Sandry had been experiencing pain behind the knee since that time.  (Tr. 606.)  Upon examination, Mr. Sandry's knee had no swelling or erythema and good flexion and extension with no pain.  (Tr. 605.)  Dr. Johnson noted that x-rays revealed slight irregularity of the joint spaces, but that Mr. Sandry "really has quite good joint space preservation medially and laterally."  (Tr. 605.)  Dr. Johnson assessed ligament strain of the left knee, prescribed Prednisone, and recommended physical

therapy.  (Tr. 605.)  Dr. Johnson stated that Mr. Sandry should return if he continued to have any problems.  (Tr. 605.)

In September 2010, Ms. Devincenzi filled out a medical opinion form requested by the Minnesota Department of Human Services.  (Tr. 573-74.)  Ms. Devincenzi noted that Mr. Sandry's knee and shoulder limitations should be addressed by orthopedics.  (Tr. 574.)  She checked the box for "Patient can perform limited employment now" and noted that Mr. Sandry was limited to no heavy lifting or extended standing, but was able to work at a desk job.  (Tr. 574.)  Ms. Devincenzi filled out another "medical assessment of ability to do work-related activities" on May 25, 2011.  (Tr. 612-15.)  Ms. Devincenzi noted that Mr. Sandry was able to walk, talk, transfer and change positions without assistance at his 12/21/10 appointment.  (Tr. 614.)

In May 2011, Mr. Sandry visited the emergency room after stepping in a hole while mowing the lawn and twisting his left knee.  (Tr. 608.)  The record contains little evidence of knee complaints between his visits of July 2010 and May 2011 due to stepping in holes.  In May 2011, Mr. Sandry reported his pain was severe with movement.  (Tr. 608.)  The left knee had full range of motion, but some swelling.  (Tr. 609.)  Physician's assistant Mark Christiansen placed Mr. Sandry in a knee immobilizer and recommended that he rest his knee, apply ice, and elevate his knee above the level of his heart.  (Tr. 609.)

Dr. Hartz filled out a medical opinion form on June 15, 2011.  (Tr. 630.)  Dr. Hartz noted Mr. Sandry's left knee osteoarthritis and checked the box on the form for "this person cannot work."  (Tr. 630.)  Dr. Hartz commented that Mr. Sandry's left knee "will not permit return to tree trimming, assembly work, unload[ing] freight, or mechanical work."  (Tr. 630.)

### B.     Mr. Sandry's Disability Report and Testimony

As part of the application process, Mr. Sandry submitted a Disability Report.  (Tr. 162-69.)  Mr. Sandry reported the following conditions that limited his ability to work:  "[s]houlder, rotator cuff, knees, back, PTSD."  (Tr. 163.)  Mr. Sandry indicated that he stopped working on February 20, 2007 "[b]ecause of [his] condition(s)."  (Tr. 163.)

On a Function Report, Mr. Sandry identified his daily activities as including taking pills, watching television, going outside for fresh air and to let out his dogs, feeding his dogs, checking on his neighbor's horse, playing with his child, and going to bed.  (Tr. 173.)  Mr. Sandry stated that his conditions affect his sleep, because his legs cramp up at night and hurt.  (Tr. 174.)  Mr. Sandry stated that he had no problems with personal care.  (Tr. 174.)  Mr. Sandry reported that he prepared meals daily but had to sit down on a bar stool to cook, that he had to get a riding lawn mower, and that his child helped with dishes and vacuuming.  (Tr. 175.)  He reported shopping one time per month, with help.  (Tr. 176.)  Mr. Sandry described his hobbies as reading and training dogs and his social activities to include playing cards and talking, but reported that he was no longer able to play with his kids outside doing things like football and other sports.  (Tr. 177-78.)  Mr. Sandry reported that he could walk one block before needing to stop and rest and that he used a cane and braces, which were prescribed by a doctor.  (Tr. 178-79.)

At the hearing, Mr. Sandry testified before the Administrative Law Judge (ALJ) as follows:  Mr. Sandry uses a cane and a walker, both which were prescribed.  (Tr. 38-39.)  Mr. Sandry's left knee is his bad knee; he can put weight on it but cannot stand on it for a long period of time.  (Tr. 43.)  He can stand for one half hour to one hour.  (Tr. 43.)  He can support his weight on his right knee pretty well, for up to two or two and one half hours.  (Tr. 43.)  For pain, Mr. Sandry is prescribed morphine, uses ice, heat, and a tens unit, and wears braces.  (Tr. 43.)

The medication helps, but the morphine makes him tired. (Tr. 44.) He uses ice, heat, and the tens unit two to three times per day. (Tr. 54.) He elevates his legs on and off throughout the day for a total of three hours to help with swelling. (Tr. 54.) Mr. Sandry believed he could lift 15 to 20 pounds, walk one block before having to rest, and sit for one to one and one half hours before needing to change position. (Tr. 46-47.) The primary thing keeping Mr. Sandry from working is his knees. (Tr. 48.) During the day, he spends time with his son and attends school functions and extra-curricular activities for his son. (Tr. 48-49.) He takes at least one nap per day. (Tr. 55.) Mr. Sandry does chores around the house, including cooking and washing clothes. (Tr. 49.) Mr. Sandry's hobbies include leather work and fishing. (Tr. 50-51.) He helps his landlord with fix-it projects. (Tr. 52.) One reason that Mr. Sandry is unable to work is that he likes to work outdoors and does not like being in a building working every day.[2] (Tr. 53.) He worked a temporary job at Morey's Fish House in spring 2011, inspecting the quality of the fish. (Tr. 40.) He could perform the jobs allowing him to sit down, but was unable to stand longer than 30 to 45 minutes. (Tr. 40-41.) Mr. Sandry does not work well with groups of people and prefers to work by himself or with just a couple people. (Tr. 42.)

### C. Residual Functional Capacity Assessment

Dr. Matthew Hofkens completed a physical residual functional capacity assessment of Mr. Sandry on March 27, 2010. (Tr. 506-13.) Dr. Hofkens reviewed the record and concluded that Mr. Sandry had the following residual functional capacity: Mr. Sandry can lift ten pounds occasionally and ten pounds frequently; he can stand and/or walk for at least two hours in an eight-hour work day, with normal breaks; he can sit about six hours in an eight-hour work day,

---

[2] As noted by the ALJ in her opinion, whether Mr. Sandry likes to do a particular type of work is not a permissible consideration in disability determinations. (Tr. 23, citing 20 C.F.R. § 404.1566(c).)

with normal breaks; his ability to push or pull is unlimited; he can climb a ramp or stairs occasionally; he can never climb a ladder, rope, or scaffold; he can balance, stoop, kneel, crouch, and crawl occasionally; and he should avoid even moderate exposure to hazards, such as machinery or heights. (Tr. 506-13.) Another agency reviewing physician, Dr. Charles Grant, reviewed Dr. Hofkens' assessment and concurred with his assessment. (Tr. 570-72.)

### F. Vocational Expert's Testimony

At the administrative hearing, the ALJ posed a hypothetical to Juletta Harren, a vocational expert, regarding an individual who can:

> lift up to 10 pounds frequently and occasionally, [] stand and/or walk at least two hours in an eight-hour day, and sit about six hours in an eight-hour day with normal breaks. The individual should never climb ladders, ropes or scaffolds, and only occasionally climbs stairs or ramps, balance, stoop, knee, crouch, or crawl. The individual should avoid even moderate exposure to work around hazards such as dangerous moving machinery and unprotected heights. From a mental standpoint the individual's limited to understanding, remembering and carrying out short, simple instructions and interacting appropriately with coworkers [and] the general public on a brief and superficial basis.

(Tr. 57.) Ms. Harren testified that such an individual could not perform Mr. Sandry's past work, but could perform assembly, inspection, and packaging jobs. (Tr. 57.) She testified that that there are 6,000 sedentary assembler jobs in the optical industry in Minnesota, 4,000 sedentary inspector jobs in the optical industry in Minnesota, and 3,750 sedentary packing jobs in the medical supply industry in Minnesota. (Tr. 58.)

The ALJ posed a second hypothetical to Ms. Harren regarding an individual with the same residual functional capacity identified in the first hypothetical, but who needs an opportunity to alternate positions after one hour, with the totals remaining six hours of sitting and two hours of standing or walking in an eight-hour day, "but not in any one fixed position more than 60 minutes." (Tr. 59.) Ms. Harren testified that the need to change positions may reduce

the availability of the jobs by ten percent, but that the individual could still perform the three jobs she identified in response to the first hypothetical. (Tr. 59.)

Mr. Sandry's attorney questioned the vocational expert about an individual who needs to elevate his legs once every four hours, for at least 30 minutes each time. (Tr. 60.) In response, Ms. Harren testified that the impact of the need to elevate one's legs would depend on how high the worker has to elevate his legs, as the need to elevate one's legs above waist level could "be a problem in that it moves the worker away from the work station," but the need to elevate one's legs on a stool or inches off the floor would not really be a problem. (Tr. 60.) Ms. Harren further noted that a worker usually gets a break after two or two and one half hours and also gets a mid-workday break after approximately four hours, so elevating one's legs above waist level could be done during break time and the person would still be able to work. (Tr. 61.) Ms. Harren testified that "if you're suggesting that this can't be done and accommodated by a break schedule and it has to be done beyond the waist level, then that wouldn't allow [] work." (Tr. 61.)

## III.   PROCEDURAL HISTORY AND ALJ'S DECISION

Mr. Sandry applied for DIB and SSI on January 21, 2010, alleging an inability to perform any substantial gainful activity since February 20, 2007 due to his disabling conditions. (Tr. 120.) Mr. Sandry was last insured for DIB on March 31, 2011. (Tr. 159.) The applications were denied by the Commissioner initially on April 16, 2010 and upon reconsideration on June 3, 2010. (Tr. 63-68, 69-73.) Thereafter, Mr. Sandry filed a written request for a hearing. (Tr. 89-90.) The hearing was held on June 30, 2011. (Tr. 33.)

On August 12, 2011, ALJ Hallie E. Larson denied Mr. Sandry's application for DIB and SSI benefits. (Tr. 8-23.) The ALJ concluded that Mr. Sandry is not disabled under sections

216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act. (Tr. 8-23.) The ALJ found that Mr. Sandry has not engaged in substantial gainful activity since February 20, 2007, the alleged onset date. (Tr. 8, 10.) The ALJ also found that Mr. Sandry has the following severe impairments: degenerative arthropathy of the knees, acromioclavicular joint arthropathy, affective disorder, and post-traumatic stress disorder. (Tr. 10.) The ALJ determined that Mr. Sandry does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404.1567(b). (Tr. 11.)

The ALJ concluded that Mr. Sandry has the residual functional capacity to perform a range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with the following specific limitations: lifting less than ten pounds frequently and occasionally; sitting (with normal breaks) for a total of six hours in an eight-hour workday; standing and/or walking (with normal breaks) for a total of about two hours in an eight-hour work day; never climbing ladders, ropes, or scaffolds; occasionally climbing stairs or ramps; occasionally balancing, stooping, kneeling, crouching, or crawling; avoiding even moderate exposure to working around hazards; understanding, remembering, and carrying out short, simple instructions; and interacting appropriately with coworkers and the general public on a brief and superficial basis. (Tr. 14.) The ALJ found that Mr. Sandry's medically-determinable impairments could reasonably be expected to cause his alleged symptoms, but that Mr. Sandry's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible. (Tr. 15.) The ALJ found that Mr. Sandry is unable to perform any past relevant work. (Tr. 21.) The ALJ concluded that there are jobs that exist in significant numbers in the national economy that Mr. Sandry is capable of performing, and as a result, Mr. Sandry has not been under a disability from February 20, 2007 through the date of the decision. (Tr. 22-23.)

On November 15, 2011, the Appeals Council denied Mr. Sandry's request for review (Tr. 1-3), making the ALJ's decision final for the purposes of judicial review. *See* 20 C.F.R. §§ 404.967, 404.981. This Court has jurisdiction to review the decision of the ALJ. 42 U.S.C. § 405(g).

Mr. Sandry filed the present Complaint on December 12, 2011. (Docket No. 1.) Mr. Sandry moved for summary judgment on July 13, 2012. (Docket No. 18.) The Commissioner moved for summary judgment on August 27, 2012. (Docket No. 20.)

## ANALYSIS

## I. LEGAL FRAMEWORK

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.

The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834,

836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a). Ordinarily, the

Commissioner can rely on the testimony of a vocational expert to satisfy his burden. *Long v.*

*Chater*, 108 F.3d 185, 188 (8th Cir. 1997).

## II.    STANDARD OF REVIEW

Review by this Court is limited to a determination of whether the decision of the ALJ is

supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v.*

*Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971) (quotation omitted). "The substantial evidence test employed in reviewing

administrative findings is more than a mere search of the record for evidence supporting the

[Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).

"Substantial evidence on the record as a whole. . .requires a more scrutinizing analysis." *Id.*

(quotation omitted).

In reviewing the record for substantial evidence, the court may not substitute its own

judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The court

may not reverse the Commissioner's finding merely because evidence may exist to support the

opposite conclusion. *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000); *Mitchell v. Shalala*,

25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213. Instead, the court must

consider "the weight of the evidence in the record and apply a balancing test to evidence which

is contradictory." *Gavin*, 811 F.2d at 1199. Therefore, even if Mr. Sandry's impairments

support a claim for disability insurance benefits, the court must affirm if there is substantial

evidence to support the ALJ's conclusion to the contrary. *Flynn v. Chater,* 107 F.3d 617, 620

(8th Cir. 1997).

## III.    REVIEW OF THE ALJ'S DECISION

Mr. Sandry argues that the ALJ's decision denying him benefits is not supported by substantial evidence on the record as a whole.  Mr. Sandry asserts that the ALJ erred in finding Mr. Sandry's subjective complaints not credible.  Mr. Sandry also asserts that the ALJ erred by not giving controlling weight to the opinions of Dr. Hartz and Dr. Baker.  Finally, Mr. Sandry contends that the vocational expert's testimony cannot support the ALJ's decision because the hypothetical posed by the ALJ failed to adequately account for all of Mr. Sandry's limitations.

### A.    The ALJ's Credibility Determination

Before an ALJ determines a claimant's RFC, "the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC." *Ellis v. Barnhart,* 392 F.3d 988, 995-96 (8th Cir. 2005) (citing *Pearsall v. Massanari,* 274 F .3d 1211, 1217-18 (8th Cir. 2001)).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001).  "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000). This Court "defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008); *Polaski v.*

*Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ need not explicitly discuss each factor. *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." *Id.* (quotation omitted). "The inconsistencies between [a claimant's] allegations and the record evidence provide sufficient support for the ALJ's decision to discredit [a claimant's] complaints of pain." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005).

The ALJ concluded that, although Mr. Sandry's medically-determinable impairments could reasonably be expected to produce his symptoms, Mr. Sandry's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 15.) The ALJ found particularly probative that Mr. Sandry's daily activities are not limited to the extent one would expect given his complaints of disabling symptoms and limitations. (Tr. 15.) The ALJ also found that Mr. Sandry had not received the type of medical treatment one would expect for a totally-disabled individual. (Tr. 16.) The ALJ also pointed to Mr. Sandry's work history and to medical opinions that Mr. Sandry was capable of performing sedentary work. (Tr. 16-19.)

"In this case, '[a]lthough the ALJ did not explicitly discuss each *Polaski* factor in a methodical fashion, [s]he acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain.'" *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (quoting *Brown v. Chater,* 87 F.3d 963, 966 (8th Cir.1996)). The ALJ listed the *Polaski* factors, acknowledged that she must consider the factors in addition to the objective medical evidence in assessing credibility, and stated that she had carefully considered all of the evidence. (Tr. 14-15.)

In assessing Mr. Sandry's credibility, the ALJ first discussed Mr. Sandry's daily activities and work activities. The ALJ noted Mr. Sandry's ability to help with various household chores, including cooking meals, putting clothes in the washing machine, grocery shopping, and mowing the lawn using a riding mower. (Tr. 15.) In addition, the ALJ pointed to Mr. Sandry's Function Report, in which he claimed to have no problems meeting his personal care needs. (Tr. 15.) The ALJ further outlined Mr. Sandry's testimony that he fishes from the shore and dock, goes ice fishing, and hunts. (Tr. 16.) The ALJ also detailed several of Mr. Sandry's medical records, which reveal additional activities. For example, Mr. Sandry was reportedly working as a salesman in May 2007, had returned to work involving climbing trees in March 2008, was treated in an emergency room in December 2008 for an injury sustained while using a sledge hammer, reportedly spent his time doing chainsaw carving in January 2009, and chopped wood for activity in November 2009. (Tr. 300, 340, 412, 464, 620.) The record contains Mr. Sandry's testimony that he made wallets and other leatherwork, helped his landlord with fix-it projects, cares for and trains his dogs, and participates in activities with his son. (Tr. 48-52, 173-78.) The ALJ also pointed to Mr. Sandry's recent work at a fish house. (Tr. 16.)

Mr. Sandry's ability to engage in all of these activities even with his knee pain discredits his claim of disabling pain. Mr. Sandry argues that his daily activities were very limited and that his ability to do the daily activities noted by the ALJ does not support a finding that he was able to do full-time competitive work. The ALJ did not equate Mr. Sandry's activities with the ability to do full-time competitive work, but rather determined that Mr. Sandry's daily activities were not consistent with his allegations of disabling pain. (Tr. 15.) Although a claimant's daily activities do not dispositively show an ability to work, Mr. Sandry's daily activities were an appropriate factor for the ALJ to consider in assessing credibility. *See Dunahoo v. Apfel*, 241

F.3d 1033, 1038 (8th Cir. 2001); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).  The ALJ reasonably concluded that Mr. Sandry's daily activities and work history are not consistent with his stated limitations.

In addition, the ALJ reasonably found that there is an absence of objective medical evidence to support Mr. Sandry's complaints.  The ALJ acknowledged Mr. Sandry's long history of knee injuries, but determined that Mr. Sandry had not received the type of medical treatment one would expect from a totally-disabled individual.  (Tr. 16.)  The record revealed substantial gaps in Mr. Sandry's treatment for knee pain, numerous unremarkable objective tests and normal examinations, and multiple health care providers who found Mr. Sandry able to perform work-related activities.  (Tr. 15-20.)

The ALJ relied on medical evidence indicating that in May 2007 Mr. Sandry reported his knee pain to average 3 to 4 out of 10 (Tr. 16); in June 2008 Mr. Sandry acknowledged to his doctor that he was independent in his activities of daily living and was observed to be ambulatory without assistive devices and able to walk on toes and heels, fully squat, and return to standing position (Tr. 17); and in March 2008 Mr. Sandry reported to his doctor that his knee was improved after treatment for knee dislocation (Tr. 17).  In October 2008 and January 2009 Mr. Sandry's right knee was normal and unremarkable.  (Tr. 17.)  Following left knee surgery in February 2009, Mr. Sandry reported that his left knee was feeling better, that he was swimming regularly and doing stationary bicycling; his physician noted that the left knee was doing well following surgery and Mr. Sandry was able to walk without assistive devices.  (Tr. 18.)  June 2009 examinations showed both knees were normal and unremarkable.  (Tr. 18.)  In July 2010, Mr. Sandry reported that his knee had been doing well until recently stepping in a hole and twisting his knee, after which the record contains little evidence of subsequent knee problems

until May 2011, when Mr. Sandry again was treated for knee pain suffered after stepping in a hole while mowing his lawn.  (Tr. 19.)  In December 2010, Mr. Sandry was able to walk, transfer and change position without assistance.  (Tr. 19.)

Mr. Sandry's complaints of disabling pain are inconsistent with this medical evidence. Although Mr. Sandry did have a history of knee pain and surgeries, the medical evidence indicates that the surgeries were somewhat successful in relieving Mr. Sandry's symptoms and that the severity of his impairment during the relevant period is consistent with the restrictions imposed by the ALJ's RFC.  As discussed above, there are significant gaps in Mr. Sandry's treatment records and numerous normal and unremarkable examinations in his treatment history.

This Court concludes that the ALJ's credibility determination is supported by good reasons and substantial evidence for the reasons discussed above.  The record shows that the ALJ properly considered the *Polaski* factors in reaching her credibility determination.

### B.     The ALJ's Weighing of Medical Source Opinions

Mr. Sandry argues that the ALJ erred by not giving controlling weight to the opinions of Dr. Hartz and Dr. Baker.  The ALJ gave little weight to Dr. Baker's opinion that Mr. Sandry was "totally disabled" at the time of his May 2008 orthopedics consultation, noting that the length of Dr. Baker's treating relationship with Mr. Sandry is unclear and Dr. Baker gave no indication of what specific limitations would prevent Mr. Sandry from working.  (Tr. 17.)  The ALJ gave some weight to Dr. Hartz's June 2011 opinion that Mr. Sandry could not return to employment performing tree trimming, assembly work, unloading freight, or mechanical work; the ALJ gave little weight to Dr. Hartz's opinion that "this person cannot work" because the opinion was on an issue reserved for the Commissioner.  (Tr. 20.)

Generally, more weight is given to opinions from treating physicians, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. § 404.1527(b)(2). If the ALJ finds a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record, then it will be accorded controlling weight. *Id.*

A treating physician's opinion does not automatically control. *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1999). Instead, the record must first be evaluated as a whole, and then the ALJ must determine if the treating physician's opinion is well supported by the whole record and deserving of such controlling weight. *See Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citing *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)). "[A] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion." *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted). If the ALJ determines that the treating doctor's opinion does not warrant controlling weight, then the ALJ must consider other factors, such as length and extent of the treating relationship, to determine the weight to be given the treating doctor's opinion. 20 C.F.R. § 404.1527(b)(2). When a treating physician's opinion regarding a claimant's residual functional capacity is not substantially supported by the objective medical evidence of record, the ALJ may rely on the opinions of consulting physicians whose opinions are more consistent with the record as a whole. *See e.g., Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).

The ALJ's reasons for giving little weight to the opinions of Dr. Baker and Dr. Hartz are supported by substantial evidence on the record as a whole. The ALJ properly noted that the length of Mr. Sandry's treating relationship with Dr. Baker was unclear. (Tr. 17.) Dr. Baker's description of Mr. Sandry as "totally disabled" appears to have been made upon Mr. Sandry's first visit with Dr. Baker. (Tr. 291-92.) It further appears from the record that Mr. Sandry had no ongoing treatment relationship with Dr. Baker after his first visit. Accordingly, it is not clear that Dr. Baker was even Mr. Sandry's "treating physician," as he had no "ongoing treatment relationship" with Mr. Sandry. *See* 20 C.F.R. § 404.1502; *Besler v. Sullivan*, 963 F.2d 176, 178 n.3 (8th Cir. 1992) ("It is not at all clear that Dr. Jersild is a treating physician. . .Dr. Jersild's report shows that he drew all of his conclusions from existing records and one session with Besler, not from an ongoing doctor-patient relationship.").

As the ALJ noted, Dr. Baker described no functional limitations that would render Mr. Sandry disabled. Dr. Baker's conclusion that Mr. Sandry was "totally disabled" is not a medical opinion, but rather is an opinion on an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d) ("Opinions on some issues, such as [an opinion that you are disabled], are not medical opinions. . .but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case. . .A statement by a medical source that you are 'disabled' or "unable to work" does not mean that we will determine that you are disabled."). Because a determination that Mr. Sandry is disabled is an issue reserved for the Commissioner, Dr. Baker's opinion was not entitled to controlling weight. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) ("[O]pinions that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight.") (citing *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)).

With respect to Dr. Hartz, it is uncontested that Dr. Hartz was Mr. Sandry's "treating physician," given the doctor's "ongoing treatment relationship" with Mr. Sandry  *See* 20 C.F.R. § 404.1502.  However, as the ALJ found, Dr. Hartz's opinion that Mr. Sandry "cannot work" is not entitled to controlling weight for the same reasons as Dr. Baker's opinion that Mr. Sandry was "totally disabled."  An opinion that an individual cannot work is on an issue reserved for the Commissioner and is not entitled to controlling weight.  *See supra* p. 24.

The Court further finds that Dr. Baker's opinion that Mr. Sandry was "totally disabled" and Dr. Hartz's opinion that Mr. Sandry "cannot work" are inconsistent with the record as a whole.  As discussed above, Mr. Sandry's treatment notes, objective test results, and testimony considered as a whole do not warrant a conclusion that Mr. Sandry is totally disabled or unable to work.  *See supra* pp. 19-21.  Dr. Baker's and Dr. Hartz's opinions are further inconsistent with the opinions of several other examining or treating sources, including Dr. Busch's July 2009 opinion and Ms. Devincenzi's September 2010 opinion.  In July 2009, Dr. Busch opined that "regarding unemployability, I agree with the [vocational rehabilitation evaluation] at Bay Pines, FL VA [in May 2008] that [Mr. Sandry] should get some retraining and could do light duty work.  I think he is employable but will need to avoid heavy lifting."  (Tr. 333.)  In September 2010, Ms. Devincenzi reported that Mr. Sandry could perform employment with the limitations of no heavy lifting or extended standing and further commented that Mr. Sandry is able to work at a desk job.  (Tr. 574.)  The ALJ also noted that Mr. Sandry had requested that treating physician Dr. Yokan sign a note indicating that Mr. Sandry was unable to work and Dr. Yokan declined to do so.  (Tr. 464.)  The ALJ gave great weight to the state agency physicians' physical assessments and findings that Mr. Sandry could perform sedentary work with various postural limitations because they were consistent with the record as a whole.  (Tr. 20.)  The ALJ

reasonably weighed these competing opinions. *See Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians.") (internal citations omitted).

The Court determines that the ALJ properly evaluated Dr. Baker's and Dr. Hartz's opinions and there is substantial evidence in the record as a whole to support the ALJ's decision to give their opinions little weight.

### C.    The ALJ's Reliance on Vocational Expert Testimony

In steps four and five, the Commissioner assesses an individual's RFC to determine if the individual's condition precludes him or her from performing the individual's past work or other work. 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v). The ALJ relied upon the testimony of the vocational expert and determined that work as an optical assembler, visual inspector, and packager are within the parameters of Mr. Sandry's RFC. (Tr. 22-23.) Mr. Sandry contends that the ALJ's determination is not supported by substantial evidence because the hypothetical submitted to the ALJ discredited Mr. Sandry's testimony. Specifically, Mr. Sandry argues that the hypothetical did not include appropriate limitations due to Mr. Sandry's need to elevate his legs above heart-level throughout the day.

At the administrative hearing, Mr. Sandry's attorney asked the vocational expert to assume an individual who needs to elevate his legs once every four hours, for at least 30 minutes each time. (Tr. 60.) In response, the vocational expert testified that the impact of such a restriction would depend on how high the individual's legs need to be elevated and that elevating one's legs above waist level could "be a problem," but could possibly be done during regular break time and thus the person would still be able to work. (Tr. 60-61.) The vocational expert

testified that "if you're suggesting that this can't be done and accommodated by a break schedule and it has to be done beyond the waist level, then that wouldn't allow to work." (Tr. 61.)

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (internal quotation omitted). "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994).

Mr. Sandry argues that the record clearly demonstrates his need to elevate his legs above heart-level throughout the day. For this proposition, he cites his own testimony that he elevates his legs on and off throughout the day for a total of three hours at the recommendation of a doctor. (Tr. 54.) He also cites a medical record from his visit to the emergency room in May 2011, when physician's assistant Mark Christiansen treated Mr. Sandry after he stepped in a hole while mowing the lawn and twisted his knee. (Tr. 608-09.) Mr. Christiansen diagnosed a left knee sprain and recommended that Mr. Sandry rest his knee, apply ice and elevate his knee above the level of his heart. (Tr. 609.)

The ALJ considered this evidence and determined that the record does not support the medical necessity of Mr. Sandry elevating his legs throughout the time period in question, nor for an extended period into the future. (Tr. 19.) The ALJ noted that Mr. Christiansen's recommendations were related to Mr. Sandry's May 2011 aggravation of his knee, rather than a long-term instruction that impacts Mr. Sandry's ability to work. (Tr. 19.) The ALJ's conclusion is substantially supported by the record. The Court agrees with the ALJ's assessment that Mr. Christiansen's recommendations were temporary and related to Mr. Sandry's recent knee aggravation and finds no other support in the record for Mr. Sandry's argument that he was

required to elevate his knee throughout the day for an extended period of time. (*See* Tr. 608-09.) The Court also notes that it appears Mr. Sandry sought no follow-up care after his visit for his May 2011 left knee sprain, despite Mr. Christiansen's instruction that he do so. In addition, even if it were true that Mr. Sandry needed to elevate his legs every four hours for up to 30 minutes during the relevant period, the record contains no support for a determination that this could not be accomplished during an employee's regular mid-workday break as suggested by the vocational expert. (*See* Tr. 60-61.)

For the reasons discussed above, the ALJ properly rejected the need for a limitation of elevating Mr. Sandry's legs throughout the day. Substantial evidence does not support a limitation as suggested by Mr. Sandry's hypothetical to the vocational expert. Because the ALJ's hypothetical question accurately reflected the RFC found by the ALJ and all limitations supported by substantial evidence in the record as a whole, the vocational expert's testimony supported the ALJ's decision. *See Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008).

## CONCLUSION

The Court finds that the ALJ's decision finding Mr. Sandry not disabled is supported by substantial evidence on the record as a whole. The ALJ properly weighed medical source opinions and substantial evidence supports the ALJ's credibility finding and the hypothetical posed to the vocational expert. The ALJ reasonably concluded that Mr. Sandry is capable of performing sedentary work, with appropriate limitations taken into account for his knee impairments.

For the foregoing reasons, and based upon all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.     Plaintiff's Motion for Summary Judgment [Docket No. 18] be **DENIED**;

2. Defendant's Motion for Summary Judgment [Docket No. 20] be **GRANTED**; and

3. If this Report and Recommendation is adopted, that judgment be entered accordingly.

Dated: February 27, 2013                                    s/ Arthur J. Boylan
                                                           Chief Magistrate Judge Arthur J. Boylan
                                                           United States District Court

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before  March 14  , 2013.